# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DERRICK WILLIAMS, | : | CIVIL NO. 3:-07-CV-1283 |
| **Plaintiff** | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| OFFICER HOLTZAPPLE, et al., | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Derrick Williams ("Plaintiff" and "Williams"), a federal inmate housed at the United States Penitentiary at Allenwood ("USP-Allenwood"), White Deer, Pennsylvania commenced this Bivens[1] civil rights action on July 16, 2007. (Doc. 1.) Presently before the court is defendants' second motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, filed on behalf of remaining defendants, Holtzapple, Hughes, Wetzel, Collier, and Kuchcinski, in which they seek an entry of judgment. (Doc. 83.) The sole remaining claim is an eighth amendment failure to protect and intervene claim in which plaintiff avers that defendants failed to protect him from a physical altercation with his cell mate by failing to intervene and remove him from his cell after he made them aware that the cell mate was

---

[1] Bivens actions are the federal counterpart to 42 U.S.C. § 1983 claims brought against state officials. Egervary v. Young, 366 F.3d 238, 246 (3d Cir. 2004) (citing Brown v. Philip Morris Inc., 250 F.3d 789, 800 (3d Cir. 2001)). "[C]ourts have generally relied upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a Bivens claim against federal officials." Schrob v. Catterson, 948 F.2d 1402, 1409 (3d Cir. 1991).

going to assault him.[2] (Doc. 83). For the reasons set forth below, the motion will be granted in part and denied in part.

## I. Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

With respect to the sufficiency of the nonmoving party's evidence, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence

---

[2] On September 24, 2008, a Memorandum and Order addressing defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6) and initial motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 was issued. The only surviving claim is the eighth amendment failure to protect and intervene claim against defendants Holtzapple, Hughes, Wetzel, Collier, and Kuchcinski.

supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; Matsushita, 475 U.S. at 586.

## II. **Statement of Material Facts**

On April 26, 2006, plaintiff was housed in the Special Housing Unit ("SHU") at USP-Allenwood, at which time he became involved in a physical altercation with his cellmate while in their cell. During this time, plaintiff and other inmates were banging on the cell doors and pushing the panic button "yelling that there was a problem." (Id. at 4; Doc. 92, at 7.) Each of the defendants was assigned to work in the SHU on that date.

Defendant Holtzapple was making rounds in the SHU when Williams demanded to be removed from his cell. (Doc. 89-2, Declaration of Officer Holtzapple ("Holtzapple Decl."), at 49-50, ¶ 4.) According to plaintiff, when Holtzapple arrived at his cell, he pointed to his swollen face and bloodied, swollen lip and said "you gotta get me out of this cell, man." (Doc. 89-2, Deposition of Derrick Williams ("Plaintiff's Dep."), at 9.) Plaintiff states that defendant Holtzapple told him that he was unable to remove him from the cell at that time because he was the only available officer and there was a staff meeting in progress. (Id. at 12.) After Holtzapple left, plaintiff states that the cell mate started punching him again, but plaintiff did not swing back, he was "just trying to get him off me, you know. Move around the cell." (Id. at 12.)

Plaintiff also submitted the declaration of James Brown ("Brown"), an inmate who was housed on the same block. Brown declares as follows:

3

> [O]n 4/26/06 I heard a thumping noise on the range. This was around 12:15 or 12:30. Inmate Williams was yelling for help. A [sic] officer came to his door and Williams said something about his cell mate attacking him. The officer left the range and the thumping continued. Myself and another inmate banged on our door and pushed our panic buttons for a while trying to get the officer to come back on the range and let Williams out of the cell. It wasn't until the warden come on the unit like a[n] hour later. The officer was order[ed] by the associate warden to remove Williams from the cell.

(Do. 92, at 7.) Plaintiff also states that Tyrone Martin was banging on the door "[y]ou know, calling the CO. Tyrone was telling then yo, come and get homie out of the cell." (Doc. 89-2, Plaintiff's Dep., at 7.)

Also of evidentiary value are two letters submitted by defendants and sealed at their request. (Docs. 74-2, at 2-4, 6-7.) The first is an April 26, 2006 letter written by plaintiff to his friend Paula, who is also known as Jean and referred to in the letter as "Boo." (Doc. 74-2, at 2; Doc. 89-2, Plaintiff's Dep., at 35.) Therein, he describes the assault and states that "the thing that hurt me, Boo, is that the officers left me in there way after I told them what happened." (Doc. 74-2, at 3.) The other letter was sent by plaintiff to the Inspector General on the same day as the incident occurred and stated the following:

> When in cell 105 on DS range around 12:30 to 1:30 in the afternoon my cellmate William McCullen (number unknown) tried to sexually assault me. I fought off his advances but I received bruises on the right side of my upper jaw bone and bruises in my mouth and gums. After the scuffle was over and my cellmate seen that I was going to fight, he stopped. I then pushed the panic button and started banging on the door for nearly a half hour. Officer Holtzapple came to the door and I told him to please get me out of the cell and pointed to my swollen fact. He just said that I had to wait till someone came back from a meeting. I was left in that cell with my cell mate for nearly a[n] hour more. Then Officer [Kuchcinsky] came by with razors and I told him, and when he came back to pick them up I told

4

him my face was pounding and he just told me that someone was coming to talk to me. It was not until the warden and associate warden came by that then the officers began to consider moving me.

(Doc. 74-2, at 6-7.)

Plaintiff states that following the incident he was informed by both staff and the cell mate that the cell mate received an incident report for having assaulted him. (Doc. 89-2, Plaintiff's Dep., at 6-7.) Plaintiff was not charged with misconduct. (Id.)

Defendant Officer Holtzapple describes the events in the following manner:

On April 26, 2006, I was making rounds in the SHU when Williams demanded that I remove him from his cell because he and his cell mate, where [sic] going to be involved in a physical alteration. At this time, I was the only Officer down the range, and since my post orders prohibit me from opening a door without the proper amount of staff available, I informed Williams that he [sic] could not remove Williams from the cell at this time. Immediately removing inmate Williams from his cell without the assistance of additional staff would have been contrary to my post orders, and would have jeopardized my safety as well as the safe and orderly running of the institution. However, I advised Williams that I would return to the SHU office, locate additional staff and a cell to move Williams to, and return to move Williams to a different cell. [ ].

I proceeded to return to the SHU office, where I began reviewing the cell rotation board in an attempt to find Williams a new cell. While reviewing the cell rotation board, I noticed the duress light in Williams' cell was activated. Myself, in addition to other staff members, responded to Williams' cell. Upon arriving at Williams' cell, Williams informed staff that he and his cell mate had just fought each other. Approximately five (5) to ten (10) minutes had passed since I had spoken with Williams.

Williams was immediately removed from his cell and escorted to the Health Services department for a medical evaluation. At this time, Williams informed Health Services staff that, "I was assaulted. I think my jaw is broken." Health Services staff noted that Williams was unable to fully open his mouth, had mild bruising inside his lower lip, had a small one (1) centimeter cut to his lip with mild bleeding, and no deformity or bruising to his right shoulder.

5

(Doc. 89-2, Holtzapple Decl., at 49-50, ¶¶ 4-6.)

On the date of the incident, defendant Kuchcinski reported to the SHU at approximately 1:00 p.m. to fulfill his duties as the SHU#3 officer. (Doc. 89-2, Declaration of Nicholas Kuchcinski, ("Kuchcinski Decl."), at 47.) He vaguely recalls Williams and his cell mate but does not recall the incident. (Id.) He states that "[i]f Williams had made me aware that he was assaulted or going to engage in a physical altercation with his cellmate, I would have located additional staff and immediately removed Williams from the cell. Immediately removing Williams from his cell, without the assistance of additional staff, would have been contrary to my post orders and would have jeopardized my safety as well as the safe and orderly running of the institution." (Id. at 47-48.) According to plaintiff, defendant Kuchcinski was made aware of the situation, but "failed to do anything." (Doc. 89-2, Plaintiff's Dep., at 26.) Kuchcinski's demeanor is described by plaintiff as follows: "He acted totally like he didn't want to be bothered with the situation. He just, you know — all he said was, you know, somebody — you know, they know up front already. And he came past twice. Twice he came past. And I told him twice, and he just ignored." (Id.)

Defendant Hughes was assigned as the SHU #5 Officer. (Doc. 89-2, Supplemental Declaration of David C. Hughes ("Hughes Decl."), at 43, ¶ 4.) As such, he was primarily responsible for observing inmates in the SHU while they were outside during recreation which involves each inmate being escorted to an outdoor recreation pen. (Id.). Recreation is suspended for approximately an hour during the afternoon meal and then resumes and lasts

6

until approximately 3:00 p.m. If recreation is complete prior to 3:00 p.m., the SHU #5

officer has numerous other duties to perform, "including but not limited to rounds, bar

tapping, searching inmates checking into the SHU, shaking down cells, doing counts,

assisting in feeding, assisting with recreation, and escorting inmates to their medical and

psychological appointments in the institution hospital outside of the SHU." (Id.)  In his

deposition, plaintiff states that Hughes knew about the fight because he was "up front."

(Doc. 89-2, Plaintiff's Dep., at 24.) It is plaintiff's position that the layout of the SHU is

such that there are a "couple of ranges that connect to a center" and that area is where the

officers do their paperwork and where "the officers is [sic] all the time." The following

exchange took place during the plaintiff's deposition:

> Q. Well, how do you know on 4/26 from 12:30 to 2:00 that is where he was?
>
> A. Because Officer Kasinsky [sic] said they know already up front. And I know who was working that day. It was Hueys [sic] Collier, Wetzel was number one and Officer Holtzapple.
>
> Q. So just because Hueys [sic] was working the SHU that day you sued him?
>
> A. He was involved.
>
> Q. How was he involved?
>
> A. Because he was up front. He knew what was going on.
>
> Q. How do you know he knew what was going on?
>
> A. Because Officer Kasinsky told me.
>
> Q. What did he tell you?

7

A.    He said they was up front.

Q.    Did he specifically say who they was?

A.    No. But I know all of the officers that was working that day that was up
      front.

Q.    How do you know who was working that day?

A.    Because they came on range. They walk up and down the range

Q.    But you said you didn't see them earlier that day.

A.    Well, see, you know, I seen them.

Q.    Well tell me exactly what he did on 4/26.

A.    Who is that?

Q.    Officer Hueys [sic].

A.    He removed me from the cell, took me to the rec cage. . . .

Q.    Well, how does Officer Hueys know about your fight with [your cell
      mate]?

A.    Well, after I got out I told him. And I'm not sure, but I assume that the
      associate warden said something to him to make him come down there and
      get me.

(Doc. 89-2, Plaintiff's Dep. at 25-26.) According to the SHU log, Hughes conducted

multiple rounds on various ranges between 12:22 p.m. and 2:07 p.m. He recalls

neither the plaintiff nor the incident. However, he does indicate that "if Warden

Miner had ordered me to remove Williams from his cell, I would have done so." (Id.

at 42, ¶ 3.) He further states that "[i]f Williams had made me aware that he was

8

assaulted or was going to engage in a physical altercation with his cellmate, I would have located additional staff and immediately removed Williams and his cellmate from the cell." (Id.)

Defendant Collier was also assigned to the SHU on the date of the incident. (Doc. 89-2, Supplemental Declaration of James Collier ("Collier Decl."), at 37, ¶ 3.) Specifically, he was assigned the duties of a SHU #3 Officer, which includes numerous duties throughout the SHU. The plaintiff described defendant Collier's role as follows:

Q.  On April 26, 2006, what did Officer Collier do?

A.  He was there too.

Q.  Where?

A.  Up front.

Q.  So you are suing any officer that was up front on the range?

A.  They all knew that I was in the cell, and they failed to respond.

Q.  Who is they?

A.  Collier, Kasinsky [sic], Hueys [sic], Wetzel and Officer Holtzapple.

Q.  How do you know they knew?

A.  Well, Kasinsky told me that they knew.

Q.  And what did he specifically say to you?

A.  He said they know up front what's going on.

Q.     Did you see Officer Collier on April 26, 2006?

A.     Yeah.

Q.     What was he doing?

A.     I believe he was helping with rec.

Q.     Did you speak with Officer Collier about fighting with [your cell mate]?

A.     No.

Q.     Never?

A.     No.

(Doc. 89-2, Plaintiff's Dep., at 48-49.) According to Collier, because of the nature of his duties on April 26, he rarely had the time to sit in the SHU Office. (Doc. 89-2, Collier Decl., at 37, ¶ 3.) He completed his shift and departed the SHU when his relief, Officer Kuchcinski, arrived at 1:00 p.m. (Id. at 37-38, ¶ 3.) He also states that "[i]f Williams had made me aware that he was assaulted or was going to engage in a physical altercation with his cellmate, I would have located additional staff and immediately removed Williams from the cell." (Id. at ¶ 4.)

Also assigned to the SHU on that day was defendant Wetzel, in the capacity of an SHU #1 Officer. (Doc. 89-2, Supplemental Declaration of Drew Wetzel ("Wetzel Decl."), at 59, ¶ 3.) Plaintiff states that when Hughes removed him from the cell, Wetzel was up front. (Doc. 89-2, Plaintiff's Dep., at 29.) The following transpired at plaintiff's deposition:

10

Q.  How do you think [Wetzel] knew about you fight with [your cell mate]?

A.  Officer Kasinsky [sic] told me they knew up front. He's the number one. He's always present.

Q.  How do you know that?

A.  I just know that from being in the SHU. The SHU -- officers that work in the SHU is different from working on the ranges. You know, it's a higher level of security; and they always have to be present. Especially the number one.

Q.  Prior to being removed from your cell how did Officer Wetzel know you were in a physical altercation with [your cell mate]?

A.  Because Officer Kasinsky told me they were up front.

Q.  They were up front?

A.  Yeah.

Q.  He named officers?

A.  He said they knew up front.

Q.  On April 26, 2006, do you believe any of the Defendants knew you and [your cell mate] were going to fight.

A.  No.

(Doc. 89-2, at 29-30). According to the record, a SHU #1 Officer has numerous duties throughout the entire SHU. (Doc. 89-2, Wetzel Decl., at 59, ¶ 3.) "As a result of these duties [Wetzel] was in and out of the SHU office throughout the day." (Id.) Wetzel states that he "was not aware that Williams had informed staff that he was going to fight his cellmate or was assaulted by his cellmate, and I did not respond to

11

Williams' cell once he activated the duress alarm." (Id. at ¶ 2.) Further, he represents

that "[i]f Williams had made me aware that he was assaulted or was going to engage

in a physical altercation with his cellmate, I would have located additional staff and

immediately removed Williams and his cell mate from the cell." (Id. at ¶ 4.)

## III. Discussion

The Eighth Amendment does not mandate that prisons be free of discomfort.

Hudson v. McMillian, 503 U.S. 1, 9 (1992). Rather, a prisoner must show that he has

been deprived of "the minimal civilized measure of life's necessities," such as food,

clothing, shelter, sanitation, medical care, or personal safety. Farmer v. Brennan, 511

U.S. 825, 832, 834 (1994) (citations omitted). To violate the Eighth Amendment,

conditions of confinement must be dangerous, intolerable or shockingly substandard.

Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985); Inmates of Allegheny County Jail v.

Pierce, 612 F.2d 754, 757 (3d Cir. 1979).

The prisoner must also show that the deprivation was sufficiently serious and

that the defendants acted with deliberate indifference, i.e., that prison officials knew

of and disregarded a substantial risk of serious harm. See Farmer, at 837; Monmouth

County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987). "[D]eliberate

indifference describes a state of mind more blameworthy than negligence," but "it is

satisfied by something less than acts or omissions for the very purpose of causing

harm or with knowledge that harm will result." Farmer, 511 U.S. at 835.

12

The restriction on cruel and unusual punishment contained in the Eighth Amendment reaches non-intervention just as readily as it reaches the more demonstrable brutality of those who unjustifiably and excessively employ fists, boots or clubs. Smith v. Mensinger, 293 F.3d 641, 651 (3d Cir. 2002). A corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation if the corrections officer had a reasonable opportunity to intervene and failed to do so. Id. at 650; see also, Urrutia v. Harrisburg County Police Dept., 91 F.3d 451, 456 (3d Cir. 1996) (noting that deliberate indifference standard should apply to claims that prison officials failed to protect inmate from violent attack whether or not the attack comes from another inmate).

## A.   Defendants Hughes, Collier and Wetzel

An entry of judgment is sought on behalf of defendants Hughes, Collier and Wetzel based on their lack personal involvement in conduct amounting to a constitutional violation. (Doc. 88, at 21-28.) "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement may be shown through allegations of personal direction or actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988); see also, Rizzo v. Goode, 423 U.S. 362 (1976); see Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976). Allegations of participation or actual knowledge and acquiescence, however, must be

13

made with appropriate particularity. Rode, 845 F.2d at 1207-08.

Plaintiff contends that defendants Hughes, Collier, and Wetzel knew about the fight with his cell mate because they were "up front." (Doc. 89-2, Plaintiff's Dep., at 24-30.) However, when questioned more closely during his deposition, plaintiff conceded that he believed these officers were up front because he saw each of them working in the SHU on the day of the incident and because Officer Kuchcinsky told him "they" were aware "up front." The record demonstrates the contrary. Each of these defendants had various duties which required them to move throughout the SHU on that date. Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, the nonmoving party may not simply sit back and rest on the allegations in the complaint. Celotex, 477 U.S. at 324. Instead, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). The record is devoid of any evidence that these defendants were simply "up front" doing paperwork. Plaintiff fails to establish by submitting affidavits, documentary or other evidence, who was up front at the time

of the incident. He wholly relies on unsupported assertions, conclusory allegations and mere suspicions, which are insufficient to establish personal involvement. Defendants Hughes, Collier and Wetzel are entitled to an entry of summary judgment.

**B.    Defendants Holtzapple and Kuchcinski**

It is clear from the recitation of material facts that there are genuine issues of material fact concerning the roles of defendants Holtzapple and Kuchcinski, whether they failed to intervene in the face of a substantial risk of harm to plaintiff, and whether their actions constituted deliberate indifference to the safety of plaintiff. An entry of summary judgment as to these defendants is not appropriate.[3] Defendants motion will be denied in this regard and the matter will proceed to trial.

## IV.    Conclusion

Based on the foregoing, defendants' motion for summary judgment (Doc. 83) will be granted in part and denied in part.

An appropriate order will issue

BY THE COURT:

JUDGE JAMES M. MUNLEY
United States District Court

Dated:    March ⟍, 2010

---

[3]Given the existence of genuine issues of material fact, the court concludes that qualified immunity is not available at this juncture.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DERRICK WILLIAMS, | : | CIVIL NO. 3:-07-CV-1283 |
| Plaintiff | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| OFFICER HOLTZAPPLE, et al., | : | |
| Defendants | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

AND NOW, to wit, this 30th day of March 2010, upon consideration of defendants' motion for summary judgment (Doc. 83), and in accordance with the foregoing memorandum, it is hereby ORDERED that:

1.  Defendants' motion is granted in part and denied in part.

2.  The motion is **GRANTED** with respect to defendants Hughes, Collier and Wetzel. The Clerk of Court is directed to TERMINATE them as named defendants. Entry of the judgment against these defendants is DEFERRED pending the final disposition of this matter.

3.  The motion is **DENIED** with regard to defendants Holtzapple and Kuchcinski and the matter will proceed to trial against these defendants.

4.  This matter is placed on the court's October calender. A scheduling order will follow.

BY THE COURT:

JUDGE JAMES M. MUNLEY
United States District Court